NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

MANUEL W., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, M.W., *Appellees.*

No. 1 CA-JV 15-0012
FILED 6-11-2015

Appeal from the Superior Court in Yuma County
No. S1400JD20130529
The Honorable Kathryn E. Stocking-Tate, Judge

**AFFIRMED**

COUNSEL

Elizabeth Brown Attorney at Law, Yuma
By Elizabeth Brown
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Laura J. Huff
*Counsel for Appellee DCS*

**MEMORANDUM DECISION**

Judge Kenton D. Jones delivered the decision of the Court, in which Presiding Judge Margaret H. Downie and Judge Jon W. Thompson joined.

**J O N E S**, Judge:

¶1        Manuel W. (Father) appeals the trial court's order terminating his parental rights to M.W. (Child).  On appeal, Father challenges the trial court's findings that (1) the State made a diligent effort to provide reunification services; (2) the State proved by clear and convincing evidence the statutory ground of six months' in out-of-home care; and (3) the State proved by a preponderance of the evidence that severance was in Child's best interests.  For the following reasons, we affirm.

## FACTS[1] AND PROCEDURAL HISTORY

¶2        Abelina F. (Mother)[2] and Father are the natural parents of Child, born three months premature in Yuma, Arizona, in June 2013.  At birth, Child required a specific eating technique or he would stop breathing.  When Mother failed to complete the training necessary to demonstrate her ability to feed Child appropriately, the hospital reported its concerns of possible neglect.  At a meeting with the Department of Child Safety (DCS) and maternal grandparents, Mother agreed to place Child in foster care for ninety days.  Father, a Mexican citizen, was unable to legally enter the United States, but was invited to participate in the meeting via telephone; he did not call in.

¶3        DCS contacted the federal agency in Mexico comparable to Arizona's Department of Child Safety, DIF,[3] to coordinate services for Father in Mexico.  During the ninety-day voluntary placement period, Father participated in one telephonic visit.  During that same period, DIF completed a home study and offered parenting classes and counseling but

---

[1]        When reviewing the trial court's termination order, we view the evidence, and draw all reasonable inferences therefrom, in the light most favorable to upholding the court's decision.  *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009) (citing *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282, ¶ 13 (App. 2002)).

[2]        Mother's parental rights were terminated in December 2014, and she is not a party to this appeal.

[3]        DIF is the commonly used acronym for The National System for Integral Family Development in Mexico, or *Sistema Nacional para el Desarrollo Integral de la Familia*.

could not complete referrals for those services until necessary improvements to the home were made and Father's financial situation was assessed; at that time, these requirements were not met and DIF did not recommend placement with Father.

¶4        In December 2013, DCS continued temporary custody of Child because neither parent had complied with the case plan tasks, which, for Father, included attending visits via telephone and demonstrating financial independence and the ability to provide a safe and stable environment for Child. A dependency petition was filed shortly thereafter, and Child was found dependent as to Father on the basis that he was unable or unwilling to care for Child. A case plan goal of family reunification was set.

¶5        Father was advised by DCS that, in order to reunify with Child, he needed to actively participate and engage in services, maintain contact with DCS, demonstrate the ability to parent Child and feed him appropriately, show an understanding of Child's medical needs "by . . . preparing a plan to address [Child]'s medical needs," maintain employment, and verify he had a stable home and a safe environment for Child. He was granted permission to appear telephonically at all hearings, child family team meetings, and Foster Care Review Board meetings, but failed to do so.

¶6        DCS was unable to provide Father services or visitation because he had no legal status in the United States and resided in Mexico. He was invited to take part in telephonic visits with his then five-month-old son, but did not do so. Although discussions were had addressing Father's ability to obtain assistance from the Mexican consulate and the possibility of his seeking a short-term visa to facilitate in-person visitation, Father did not follow through on any of these options. He did not maintain consistent contact with his attorney, could not be reached by telephone, and spoke with the DCS caseworker only two times in fifteen months.

¶7        Father completed a psychological evaluation through DIF, and was thereafter referred for parenting classes and counseling. Father completed 36 hours of parenting classes but never engaged in the recommended therapy or provided any explanation for failing to do so. DIF ultimately approved Father's home, but DCS reiterated that Father needed to (1) create a plan to ensure Child's medical needs would be met, and (2) form a bond with Child in order to maintain his parental rights.

**¶8**        Without these requisites having been accomplished, in August 2014, the case plan was amended to severance and adoption.  DCS filed a motion to terminate the parent-child relationship, alleging grounds for severance existed under Arizona Revised Statutes (A.R.S.) section 8-533(B)(8)(b)[4] because Father "substantially neglected or willfully refused to remedy the circumstances that cause[d C]hild to be in an out-of-home placement."[5]

**¶9**        Although Child's medical condition was stable at the time of trial and there were no immediate concerns, Child experienced a myriad of ongoing medical issues as a result of his premature birth, requiring "constant monitoring" and quick action in the event of an emergency.  For example, Child required monthly RSV shots between November and March to protect his lungs.  Child was born with an eye condition and a hole in his heart, both of which needed monitoring.  He later developed plagiocephaly, requiring him to wear a helmet twenty-three hours per day and travel to Phoenix from Yuma every two weeks to see a specialist.  Child also experienced hearing problems and speech delays; tubes were put in his ears and he has continued to receive special attention from the foster parents to address his speech issues.  During the period of dependency, Father did not participate in the care or treatment of Child, either generally or specifically, in regard to any of these conditions and did not inquire as to the child's health except for one conversation with the DCS caseworker where Father expressed his belief that the plagiocephaly was not a big deal because he, too, had a misshapen head.

**¶10**        A trial was set in December 2014 on DCS's motion to terminate, and DCS proceeded on the statutory ground that Child had been in an out-of-home placement for more than six months and Father substantially neglected or willfully refused to remedy the circumstances causing the child to be in an out-of-home placement, namely, refusing to participate in reunification services.  On the day of trial, Father's counsel requested a continuance, arguing first, DCS did not offer reasonable services when it failed to offer visitation at the port of entry, and second, that Father should have additional time to investigate the availability of medical care for Child close to his home.  The motion was denied.

---

[4]        Absent material changes from the relevant date, we cite a statute's current version.

[5]        The State also alleged neglect pursuant to A.R.S. § 8-533(B)(2) but dismissed this allegation prior to trial.

4

¶11　　　　Father appeared telephonically at the beginning of the hearing but was disconnected, did not call back, and did not testify. The DCS caseworker testified, based upon her personal observations and those of her DIF counterpart in Mexico, that Father did not comprehend the extent of Child's medical needs and did not comply with the case plan; as a result of his failure to engage, he had failed to show he could provide for, or safely care for, Child. A different DCS employee testified, anecdotally, to a case the agency had been involved in approximately six years prior where DCS worked with DIF and the Mexican consulate to coordinate "a very short contact" between the child and father at the port of entry. However, subsequent efforts in a more recent case to facilitate similar visits between a mother and child had been unsuccessful.

¶12　　　　The trial court found DCS had made diligent efforts to provide appropriate reunification services, mostly through its contacts at DIF, including case management services, case plan staffing, individual counseling, parenting classes, telephonic visitation, a psychological evaluation, and a home study, but Father had failed to establish a bond with Child or otherwise illustrate his ability to care for the Child, who may require future medical intervention. It further found the State had proven by clear and convincing evidence the grounds for severance following six months' time in care, and by a preponderance of the evidence that severance was in Child's best interests.

¶13　　　　Father timely appealed. We have jurisdiction pursuant to A.R.S. §§ 8-235(A), 12-120.21(A)(1) and -2101(A)(1).

## DISCUSSION

¶14　　　　Parental rights may be terminated if a statutory ground for severance is found to exist by clear and convincing evidence, and the court also finds that severance is in the child's best interests by a preponderance of the evidence. A.R.S. §§ 8-533(B), -537(B); *Kent K. v. Bobby M.*, 210 Ariz. 279, 288, ¶ 41 (2005); *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249, ¶ 12 (2000). We do not reweigh the evidence on appeal; as the trier of fact, the trial court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004). "Accordingly, we view the evidence and reasonable inferences to be drawn from it in the light most favorable to sustaining the court's decision," *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009) (citing *Jesus M.*, 203 Ariz. at 282, ¶ 13), and will affirm a termination order "unless there is no reasonable evidence to support" the

court's factual findings, *Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 377, ¶ 2 (App. 1998) (citing *Maricopa Cnty. Juv. Action No. JS-4374*, 137 Ariz. 19, 21 (App. 1983), and *Maricopa Cnty. Juv. Action No. JS-378*, 21 Ariz. App. 202, 204 (1974)).

## I.      DCS Made Diligent Efforts to Provide Reunification Services.

**¶15**      Pursuant to A.R.S. § 8-533, a parent's rights to a child under the age of three who has been in an out-of-home placement for at least six months may be terminated where the parent "substantially neglect[s] or willfully refuse[s] to remedy the circumstances that cause the child to be in an out-of-home placement, including refusal to participate in reunification services offered by [DCS]." A.R.S. § 8-533(B)(8)(b). Where severance is based upon the length of time a child is in care, DCS must also prove that it "has made a diligent effort to provide appropriate reunification services." *Marina P. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 326, 329, ¶ 18 (App. 2007) (citing *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004)); *see also* A.R.S. § 8-533(B)(8), (D). Father argues, first, that DCS did not make a diligent effort to provide reunification services because it did not offer him "in-person" visitation with Child at the port of entry into the United States and did not pay for him to receive counseling.[6]

**¶16**      While sympathetic to the challenges Father faced as a result of his financial limitations and inability to enter the United States, DCS

---

[6]      DCS contends Father waived any objection to the adequacy of the services provided by "remain[ing] silent" on the issue until the day of the severance trial. Because the trial court is "in a much better position than this court to evaluate the effectiveness and impact of the service provided," a parent who does not object to the adequacy of services in the trial court waives the issue on appeal. *Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 178-79, ¶¶ 15-16 (App. 2014). Here, however, Father's counsel identified concerns with the services available to Father at the first hearing and moved for a continuance of the severance trial until DCS could arrange visitation at the port of entry. *See id.* at 179, ¶ 18 (noting "parent dissatisfied with the services actually being provided can raise the issue with the juvenile court in a variety of ways," including "at a termination hearing"). Thus, although "early and often" may be the better practice for a parent seeking to maintain his parental rights, we cannot say that Father's objection made to the trial court was too late to preserve the issue for appeal.

was not required to "provide 'every conceivable service,'" and need only provide a parent with the time and opportunity to demonstrate his ability to care for the child. *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.,* 193 Ariz. 185, 193, ¶ 37 (App. 1999) (quoting *Maricopa Cnty. Juv. Action No. JS–501904,* 180 Ariz. 348, 353 (App. 1994)). Father was given ample opportunity.

**¶17** The record reflects Father was provided case management services, case plan staffing, parenting classes, a psychological evaluation, and a home study. Father was also offered individual counseling through DIF based upon the recommendation of the psychologist. Although DCS was unable to pay for the service because Father is not a U.S. citizen, it nonetheless made a good faith effort, given the circumstances, to provide Father the time and opportunity to participate in counseling. *See Mary Lou C.,* 207 Ariz. at 50, ¶ 18 (taking into account parent's circumstances in assessment of whether reunification services were reasonable); *cf. Yvonne L. v. Ariz. Dep't of Econ. Sec.,* 227 Ariz. 415, 422-23, ¶¶ 29, 35 (App. 2011) (finding DCS made "active efforts" to prevent break up of family where caseworker advised non-resident father of his need to attend counseling and encouraged him to call if he had difficulty making the arrangements); *Mary Ellen C.,* 193 Ariz. at 192-93, ¶¶ 37-42 (reversing severance where DCS "neglect[ed] to offer the very services that its consulting expert recommend[ed]"). It is not required to ensure his participation. *JS-501904,* 180 Ariz. at 353 (citing *Maricopa Cnty. Juv. Action No. JS-5209 and No. JS-4963,* 143 Ariz. 178, 189 (App. 1984)).

**¶18** With regard to in-person visitation, there is no evidence DCS was capable of facilitating an in-person meeting at the port of entry into the United States; the single anecdotal example provided required cooperation of DIF and the Mexican consulate, which had recently been declined. And Father fails to articulate how in-person visitation would have assisted him in addressing the issues causing Child to be in an out-of-home placement — namely, his unwillingness and inability to care for Child. Moreover, to date, the entirety of Father's interaction with Child, now nearly two years old, has been comprised of one telephonic visitation.[7] Even if in-person visitation were possible, it is not reasonable to expect DCS to offer expanded visitation when the offered contact is declined without explanation.

---

[7] Father also argues the trial court erred in finding he failed to establish a bond with Child. There is a single conclusion to be drawn from Father's lack of contact with Child, and we find no error in the trial court's assertion of the obvious.

¶19 Considering the totality of the circumstances and viewing the facts in the light most favorable to sustaining the trial court's judgment, the record supports the finding of diligent efforts.

## II. Father Substantially Neglected or Willfully Refused to Remedy the Circumstances that Caused Child to be in an Out-of-Home Placement.

¶20 Father next argues the trial court erred in finding he substantially neglected or willfully refused to remedy the circumstances that caused Child to be in an out-of-home placement. At the time of severance, DCS identified two major concerns: Father was unable to financially provide for Child, and was either unable or unwilling to appreciate the serious nature of Child's medical conditions and act accordingly.

¶21 The record supports the trial court's findings as to each circumstance. The DCS caseworker testified Father was the main source of income for a family comprised of four adults and one newborn and made "barely enough" to cover the expenses of the shared home. Although Father did complete a parenting class, he presented as immature and irresponsible. He did not participate in, follow-up on, or inquire as to Child's medical treatment, and on the one occasion Father was given information regarding Child's medical condition, he minimized the effect on Child's well-being and was unsupportive of the treatment being sought. Additionally, after fifteen months, Father had made no effort to secure medical insurance for Child in Mexico, locate nearby medical facilities, or even attempt to "prepar[e] a plan to address [Child]'s medical needs," as specifically delineated in the case plan. Thus, the DCS caseworker remained concerned as to whether Father could, or would, react quickly and obtain medical care for Child.

¶22 Focusing on "the level of the parent's effort to cure the circumstances," as we are required to do, *Marina P.*, 214 Ariz. at 329, ¶ 20, substantial evidence supports the trial court's findings that Father substantially neglected or willfully refused to remedy either the financial impediments or DCS's articulated concerns with Child's medical needs that prevented reunification. Nor are we persuaded by Father's argument that he was relieved of the responsibility of demonstrating his willingness and ability to parent by waiting until the worst of Child's medical conditions had resolved through the diligence and commitment of the foster parents. Accordingly, we find no error.

### III. Termination of the Parent-Child Relationship is in Child's Best Interests.

¶23        A finding of one of the statutory grounds for severance under A.R.S. § 8-533, standing alone, does not justify the termination of parental rights; it must also be proved by a preponderance of the evidence that termination of the parent-child relationship is in the child's best interests. *Mary Lou C.*, 207 Ariz. at 47, ¶ 8 (citing *Michael J.*, 196 Ariz. at 249, ¶ 12). Father argues the trial court erred in determining the child would be harmed if severance was not granted.

¶24        As an initial matter, to establish best interests, it must only be shown the child "would derive an affirmative benefit from termination *or* incur a detriment by continuing in the relationship," not both. *Oscar O.*, 209 Ariz. at 334, ¶ 6 (emphasis added). The benefit to the child, particularly when severance is sought based upon the child's length of time in an out-of-home placement, is the opportunity for permanency where "'parents maintain parental rights but refuse to assume parental responsibilities.'" *Id.* at 337, ¶ 16 (quoting *Maricopa Cnty. Juv. Action No. JS-6520*, 157 Ariz. 238, 243 (App. 1988)). In evaluating the child's opportunity for permanency, the trial court considers whether there is a current plan for the child's adoption and whether the current placement is meeting the child's needs. *Bennigno R. v. Ariz. Dep't of Econ. Sec.*, 233 Ariz. 345, 350 (App. 2013) (citations omitted).

¶25        Here, the trial court found termination of the parent-child relationship was in Child's best interests because he was "placed in a licensed foster home which is meeting [C]hild's needs and who intend to adopt," and that severance would further the permanency plan of adoption. The record reflects Child had been with the same placement since his release from the hospital and had bonded to the foster parents and their five other children. The court found Child had overcome an eye condition, a heart defect, plagiocephaly, respiratory weakness, and difficulties with feeding, hearing, and speech, largely through the assistance and diligence of the placement. Additionally, Child is adoptable, and the foster parents are willing to adopt Child and provide a safe, stable environment that will meet his needs. Based upon these circumstances, the DCS caseworker testified that if the termination were not to proceed, Child would be harmed by continuing the dependency because he would be deprived of permanency.

¶26        The best interests finding is supported by the record, and we find no abuse of discretion.

## CONCLUSION

¶27 We affirm the order of the trial court terminating Father's parental rights to Child.



Ruth A. Willingham · Clerk of the Court
FILED: ama